UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | |
|---|---|
| Plaintiff, | Case No. **'23 CV0566 BTM JLB** |
| v. | |
| Zhen Li | |
| Defendant | |

**DECLARATION OF RAE BOGANEY, M.D.**

I, Dr. Rae Boganey, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1. I am an Internal Medicine physician licensed by the Medical Board of California and I am currently employed by Correctional Medicine Associates, P.C. as the Clinical Director at the Otay Mesa Detention Center (OMDC). I have held this position since September 10, 2020. Prior to my employment with Correctional Medicine Associates, P.C. I was employed by Southern California Permanente Medical Group for approximately 17 years as a Clinical Physician.

2. OMDC is owned and operated by CoreCivic, Inc. CoreCivic is the service provider under a detention service contract with U.S. Immigration and

1

Customs Enforcement (ICE), with the United States Marshals Service (USMS) as an authorized user. OMDC houses both ICE immigration detainees and USMS criminal detainees. CoreCivic, Inc. provides healthcare services to OMDC's detained population.

3. CoreCivic, Inc. is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody. The health, safety, and welfare of those detained in its custody are among the agency's highest priorities, and CoreCivic, Inc. has protocols in place to ensure that any patient on a hunger strike within its detention facilities is promptly and appropriately addressed and treated.

4. As the Clinical Director at OMDC, my duties include providing medical care for detainees at the facility, as well as monitoring and reviewing operations and standards of care delivery in collaboration with the Health Service Administrator.

5. This declaration is made in support of the Complaint and Motion by the United States of America to perform involuntary vital sign measurements, examination, intravenous hydration, and involuntary feedings for Zhen Li, A#### ### 829, who is detained at OMDC.

6. I am the treating physician of Mr. Li, and I make this declaration upon a review of his medical record and my examination and treatment of him.

7. Mr. Li is a native and citizen of China. He entered OMDC on November 23, 2022.

8. On February 25, 2023, Mr. Li missed his ninth consecutive meal and was classified as a hunger striker pursuant to ICE guidance. Mr. Li states that he is on a hunger strike because he wants to remain in the United States. Mr. Li missed his first meal on February 22, 2023 and has missed 107 meals as of dinner on March 29, 2023. He has had periods in which he has consumed extremely small amounts of water here at OMDC and while hospitalized at Paradise Valley Hospital (PVH) to manage his dehydration. From March 25 to March 28, 2023, he was admitted to Paradise Valley Hospital for ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. On March 28, 2023, he was discharged from the hospital and returned to ICE custody at OMDC, where he continues to refuse to eat.

9. Mr. Li's current weight is ▉▉▉▉ as assessed upon return from the hospital on March 28, 2023. His weight on day 3 of his hunger strike was ▉▉▉ pounds. Mr. Li has lost ▉▉▉ pounds during this time period, which reflects a loss of ▉▉▉ of baseline body weight since the onset of his hunger strike.

10. Mr. Li has been evaluated by a psychiatrist at OMDC and displays no evidence of a psychiatric condition that would cause him not to eat or drink. He is

3

participating in the hunger strike of his own free will. He was evaluated by a psychiatrist at PVH and it was determined that his hunger strike was not related to suicidal thoughts or behaviors. Mr. Li declined medications while at the hospital.

11. Mr. Li has been counseled multiple times by medical staff about the effects of self-imposed dehydration and starvation on his body. He has also been informed of the involuntary hydration and feeding procedures that will be pursued to prevent injury and/or death to himself should he continue not to eat and drink.

12. Mr. Li is able to ambulate with stand-by assistance. His seated vitals as assessed on March 28, 2023, upon return from hospital were temperature ▇; blood pressure ▇; heart rate ▇ pulse oximetry ▇ on room air; and weight of ▇ His vitals as assessed at 0720 on March 28, 2023, at PVH were blood pressure ▇; heart rate ▇ and respiratory rate ▇.

13. He remains in ICE custody at OMDC and under medical observation in the Medical Housing Unit.

14. Mr. Li has repeatedly refused basic daily physical examinations, as well as routine laboratory testing by the OMDC medical staff. While at PVH he repeatedly refused physical exams and labs as well. On March 25, 2023, ▇
▇
▇
▇

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████

15. At this point, laboratory tests are also medically necessary to evaluate the metabolic state resulting from the patient's prolonged hunger strike to include electrolytes, kidney function, liver function, and nutritional status.

16. The laboratory tests that need to be obtained include:

   a. Complete metabolic panel. This test reveals an increase in markers of kidney such as tests BUN (blood urea nitrogen), creatinine level and proteins in view of any renal damage. It also reveals electrolyte disturbances that can lead to heart arrhythmias such as potassium, phosphate, magnesium, and glucose levels.

   b. Complete blood count. This test reveals the hemoglobin and hematocrit levels to check for anemia.

   c. Urinalysis. This test reveals the presence of ketones, blood and crystals in the urine to help determine severity of dehydration.

   d. Thiamine levels are used to assess state of malnutrition noted by deficiency at day 14 of a hunger strike.

   e. Creatinine phosphokinase (CPK), which is an enzyme found inside muscle cells and is released into the blood when the muscle cells rupture. The increase in CPK can lead to rhabdomyolysis, a breakdown of muscle tissue that can fatally damage other vital organs.

   f. Prealbumin, used as a marker for nutritional status evaluation. Prealbumin will decrease over time the longer a patient fails to consume adequate nutrition, and the prealbumin level correlates with patient morbidity and mortality risk. Normal prealbumin is 15-35 mg/dL. When prealbumin falls to 5-11mg/dL, significant

    morbidity risks exist, and aggressive nutritional support is necessary.

  g. Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.

17. It is difficult to predict for how long the human body can survive without food; if an individual does not have adequate fat stores, this time decreases significantly. If an individual goes without water for approximately eight to ten days, he will suffer from dementia and delirium, seizures and ultimately become unconscious. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest.

18. Mr. Li's condition is expected to decline as his hunger strike continues. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms which are severe enough to warrant hospitalization. As discussed above in paragraph 8, Mr. Li has already suffered negative effects from his refusal to ingest nutrients and was transported to the hospital for emergency care.

19. Medical literature reflects that metabolic imbalance, caused by fasting, is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight.

20. The OMDC medical staff has explained to Mr. Li the medical necessity to eat and drink to preserve his health and the medical risks of continuing his hunger

strike. Other staff members have repeatedly talked to Mr. Li in attempts to convince him to eat solid foods, liquid or bland diets, and/or drink nutritional supplements. However, Mr. Li has continued to refuse to eat solid food and drink nutritional supplements appropriate to sustain life.

21. I have personally explained to Mr. Li my serious concerns regarding his condition and the medical risks involved with a continued lack of nourishment. That is, he risks significant and ongoing metabolic changes induced by his decreased nutritional intake. If he continues his hunger strike, he will reach a state of severe metabolic imbalance, with a high risk of adverse consequences such as permanent damage to his kidneys and liver, heart failure, and serious risk of death. Mr. Li stated to me that he would continue his hunger strike.

22. In my professional medical judgment, if Mr. Li continues his hunger strike, with the aggravating factor of inadequate oral hydration, he will reach the point where he will require immediate medical intervention to prevent further deterioration and serious medical complications. Continued fasting will result in permanent damage to his internal organs and has the potential to become life threatening. Metabolic imbalance, if left untreated, will cause fatal arrhythmia and/or cardiac arrest. Additionally, and taking into consideration the present COVID-19 world pandemic, his prolonged starvation will continue to weaken his

immune system, further exposing him to serious, and possibly fatal consequences should he ever be exposed to COVID -19.

23. Medical intervention is required to feed Mr. Li nutritional supplements through a nasogastric tube and/or intravenous line to provide him the nutrition he needs. ███████████████████████████████████████████████████████████████████████████████████████

24. In addition, it is necessary to perform laboratory tests and physical evaluation to monitor and assess his clinical condition. If his laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer such medications intravenously.

25. Based on Mr. Li's current physical condition, and the fact that he has not had adequate nutritional intake for 33 days, nor had appropriate oral fluid intake, it is my informed medical opinion to a reasonable degree of medical certainty that involuntary intravenous hydration and feedings are required at this time. His lack of nutritional intake compounded by his voluntary dehydration can drastically exacerbate the effects of his hunger strike. Involuntary hydration and feeding would be pursued only as necessary to prevent injury, further dehydration, malnourishment, organ failure, or loss of life due to his self-imposed hunger strike. Involuntary feeding would be accomplished through a nasogastric tube or intravenous means.

26. The issuance of a court order to perform involuntary feedings and hydration, blood draws and all necessary physical examinations is medically necessary to preserve and sustain Mr. Li's health, welfare, medical safety, and life at this time because there is a substantial risk of serious harm to the patient's health, including death.

27. To ensure the patient's health, welfare, medical safety, preservation of life, should the patient refuse to cooperate with laboratory blood draws, involuntary hydration and/or involuntary nutrition, medical soft restraints will be required to immobilize the patient and prevent unnecessary injury to both the patient and medical staff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of March 2023

Rae Boganey, MD
Clinical Director
Otay Mesa Detention Center
7488 Calzada de la Fuente
San Diego, CA 92154